UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
C.A., INC.,

                Plaintiff,

-against-

STONEBRANCH, INC. and STEVEN L.
TURPIN,

                Defendants.
------------------------------------------------------------X

OPINION AND ORDER
12-CV-5988 (SJF)

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★    NOV 17 2014    ★

LONG ISLAND OFFICE

FEUERSTEIN, District Judge:

Before the Court is Stonebranch, Inc.'s ("Stonebranch" or "defendant") renewed motion to dismiss pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2) for lack of personal jurisdiction. For the reasons that follow, Stonebranch's motion is **GRANTED**.

I. **Background**

A. **Facts**

Plaintiff C.A., Inc. ("CA" or "plaintiff") is a management software and solutions company that offers information technology and business process services to a wide range of business and institutional clients. Compl. ¶ 8. Defendant Stonebranch, Inc. ("Stonebranch"), a Georgia corporation with its principal place of business in Alpharetta, Georgia, competes with plaintiff in the mainframe and distributed computer (client/server) job scheduling and workload automation software market, selling and delivering such software to businesses, municipalities and other institutions in North America. *Id.* at ¶ 12; Dec. Clay (DE 83-3), ¶ 4.[1] Defendant Turpin ("Turpin") resides in St. Petersburg, Florida. *Id.* at ¶ 5.

---

[1] Gwyn Clay has been employed by Stonebranch since January 11, 2011 and was its Chief Executive Officer from March 2011 to March 2013, at which time he became Chief Product Officer. Dec. Clay ¶ 2, 4.

On January 3, 2006, plaintiff hired Turpin, who reported to CA's office in Tampa, Florida, as Director of Technical Sales. *Id.* at ¶ 6. Turpin executed an Employment and Confidentiality Agreement ("employment agreement") wherein he agreed to maintain the confidentiality of CA's proprietary information. The employment agreement also included a covenant not to compete and a forum selection clause, which provided that the agreement was to be governed by and construed in accordance with New York State law and which limited the filing of a legal action to the federal or state courts located in Suffolk County, New York. *Id.* at ¶¶ 46, 48; Mem. in Supp., Exh. B ¶ 16(d).

Turpin resigned from CA on May 8, 2012 and left plaintiff's employ on May 11, 2012. Compl. ¶¶ 31, 33. On May 14, 2012, Turpin began working for Stonebranch, primarily from his home in St. Petersburg, Florida, as Director of Technical Sales and Services Operations. *Id.* at ¶ 35; Turpin Decl. ¶¶ 2, 7.

The complaint alleges that Turpin provided Stonebranch with confidential and proprietary CA information in order for Stonebranch to formulate a bid for a Software Upgrade Project for one of CA's existing clients, the Ohio Public Employee Retirement System ("OPERS"). Compl. ¶¶ 25-38. On June 7, 2012, OPERS advised CA that it awarded the upgrade project to Stonebranch instead of CA. *Id.* at ¶ 39. CA alleges that it lost more than $1.8 million in revenue as a result of losing the OPERS contract. *Id.* at ¶ 40.

## B. Procedural History

On December 4, 2012, CA commenced this action against defendants alleging: (1) faithless servant, breach of contract and breach of fiduciary duties against Turpin; (2) tortious interference with existing and prospective economic relations; (3) misappropriation of trade

secrets; and (4) unfair competition against both defendants. CA also seeks attorney's fees and costs against Turpin based on the employment agreement and an injunction enjoining Stonebranch and Turpin from using CA's proprietary information.

Defendants moved to dismiss the complaint pursuant to FRCP 12(b)(2) for lack of personal jurisdiction and 12(b)(3) for improper venue. The motion was referred to Magistrate Judge Arlene R. Lindsay who issued a Report and Recommendation ("Report") recommending that the motion be granted with respect to Stonebranch based upon plaintiff's failure to establish personal jurisdiction over Stonebranch in accordance with New York's Civil Practice Law and Rules ("CPLR") § 302(a)(1). The Report also recommended that plaintiff's application for jurisdictional discovery be denied with leave to renew if plaintiff was granted leave to amend the complaint to assert general jurisdiction over Stonebranch pursuant to CPLR § 301.

Stonebranch objected to the Report's recommendations because plaintiff had not sought leave to amend its complaint and the complaint failed to allege facts consistent with general jurisdiction over Stonebranch. Plaintiff argued that in its memorandum opposing Stonebranch's motion to dismiss, it presented facts establishing personal jurisdiction over defendant under the "solicitation plus" test of "doing business" and therefore it should be granted leave to amend *sua sponte*. By Order dated March 7, 2014, plaintiff's request to engage in limited discovery in order to determine whether this Court had jurisdiction over Stonebranch pursuant to CPLR § 301 was granted. Following discovery, the parties submitted revised memoranda to Stonebranch's FRCP 12(b)(2) motion.

## II. Discussion

### A. Legal Standard for Rule 12(b)(2) Motions

Federal Rule of Civil Procedure 12(b)(2) "permits a defendant to challenge a court's personal jurisdiction over it prior to the filing of an answer or the commencement of discovery." *A.W.L.I. Group, Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 562 (E.D.N.Y. 2011). In considering a motion to dismiss for lack of personal jurisdiction, a court may rely on materials beyond the pleadings. *Phillips v. Reed Group, Ltd.*, 955 F. Supp. 2d 201, 225 (S.D.N.Y. 2013) (when considering a 12(b)(2) motion, "the Court may also rely on submitted affidavits and other supporting materials submitted in relation to the motion"). "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). Where a court opts to determine the jurisdictional issue without an evidentiary hearing or discovery, a plaintiff need "make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). When, however, a court permits the parties to engage in jurisdictional discovery, the party seeking to establish jurisdiction bears "the burden of proving by a preponderance of the evidence that personal jurisdiction exists." *Landoil Resources*, 918 F.2d at 1043. Under either scenario, the "pleadings and affidavits are construed in the light most favorable to the plaintiff, and all doubts are resolved in its favor." *Mazloum v. International Commerce Corp.*, 829 F. Supp. 2d 223, 227 (S.D.N.Y. 2011).

In order to determine whether a federal court has personal jurisdiction over a foreign

corporation, it first looks to the law of the state in which the district court sits. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (citing *Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998)); *see Arrowsmith v. United Press Intern.*, 320 F.2d 219, 223 (2d Cir. 1963) (holding that personal jurisdiction over a defendant in a "diversity action is determined by the law of the forum in which the court sits."). If a court determines that it can exercise personal jurisdiction over a defendant under the state's law, it must then consider "whether asserting jurisdiction under that provision would be compatible with requirements of due process established under the Fourteenth Amendment to the United States Constitution." *Id.* See *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

**B.     Analysis**

    **1.     New York's CPLR § 301**

New York's general jurisdiction statute, CPLR § 301, provides that a "court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." New York courts have interpreted § 301 to allow the exercise of personal jurisdiction over a foreign corporation that is 'engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in [the state]' even if the cause of action is unrelated to the defendant's New York activities." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (quoting *Delagi v. Volkswagon A.G. of Wolfsburg, Germany*, 278 N.E.2d 895, 896 (N.Y. 1998)) (internal citations omitted). "[A] corporation is 'doing business' and is therefore 'present' in New York . . . if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Wiwa v. Royal Dutch*

*Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (quoting *Tauza v. Susquehanna Coal Co.*, 115 N.E. 915, 917 (N.Y. 1917)). The Supreme Court recently held that a "court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.' " *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)).

"Whether a corporation may be deemed to be present by virtue of its doing business in the jurisdiction depends upon the application of a 'simple and pragmatic' test," *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (quoting *Bryant v. Finnish Nat'l Airline*, 208 N.E.2d 439, 441 (N.Y. 1965)), which is "necessarily fact sensitive because each case is dependent upon its own particular circumstances." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. (1991). In determining whether a defendant is doing business in New York, courts traditionally focus on: (1) the existence of an office in New York; (2) the solicitation of business in the state; (3) the presence of bank accounts and other property in the state; and (4) the presence of employees or agents in New York. *Hoffritz for Cutlery*, 763 F.2d at 58.

### 2. Personal Jurisdiction Over Stonebranch Pursuant to § 301

Examination of the above factors demonstrates that nearly all of Stonebranch's contacts with New York do not establish that it is "doing business" or is "at home"in New York. Stonebranch is not licensed or authorized to do business within the State of New York and no

one has been designated to accept service of process on its behalf. Dec. Clay ¶ 4. During the time period from January 1, 2009 through December 6, 2012 (the "relevant period"), Stonebranch did not own, lease or otherwise use or possess any retail space, storage places, offices, warehouses or other type of real or business property in New York. *Id.* at ¶¶ 4, 6. Stonebranch has never maintained any financial, business or product documents in the state, nor has it ever had any offices, agents or sales representatives, independent or otherwise, in New York. *Id.* at ¶¶ 8, 9. During the last three (3) months of the relevant period, Stonebranch had one (1) employee, Tracy Hagar, who resided in Colorado when he was hired and relocated to New York in September 2012 for personal reasons. *Id.* at ¶ 10. During the relevant period, Hagar, who did not service any New York customers, traveled outside of New York on a nearly full-time basis to work as a service technician. *Id.*

Stonebranch did, however, solicit business in New York during the relevant period. "[T]he '[s]olicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services.' " *Landoil Resources*, 918 F.2d at 1043 (quoting *Laufer v. Ostrow*, 434 N.E.2d 692, 694 (N.Y. 1982)). If, however, the solicitation is substantial and continuous, and defendant engages in other activities of substance in the state, then personal jurisdiction may properly be found to exist." *Id.* at 1043-44. Under this "solicitation-plus" test, "once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.' " *Aquascutum of London, Inc. v. S. S. Amer. Champion*, 426 F.2d 205, 211 (2d Cir. 1970)

Stonebranch claims, and plaintiffs do not dispute, that it had six (6) customers with a

New York shipping[2] or billing address during the relevant period: (1) PulsePoint/Context Web; (2) Wireless Generation (Amplify); (3) Depository Trust & Clearing Corporation ("Depository Trust"); (4) Double Rock; (5) Proclivity; and (6) Investor Analytics. Rev. Reply (DE 83) pp. 13-14. Stonebranch's figures also include revenue from the Texas Department of Transportation, a non-New York customer, because the invoice was billed to its third-party administrator IBM, which maintains a post office box in New York. Dec. Clay p. 3 n.1.

CA alleges, however, that Stonebranch has five (5) additional New York customers for whom no revenue was included and argues that Stonebranch significantly understated its business in New York: (a) [X=1] Inc.; (b) Opera Solutions; (c) Saks, Inc. ("Saks"); (d) Bayer Corporate and Business Services ("Bayer"); and (e) Reed Elsevier. Rev. Mem. in Opp. (DE 81) p. 6; Dec. Cole, Exhs. H pp. 14; J and K. Stonebranch claims that although these customers may or may not have New York offices, their business with Stonebranch transpired outside of New York and, furthermore, with respect to Opera Solutions, [X + 1] Inc. and Bayer, the New York designation was a typographical error. Rev. Reply pp. 3, 14; Dec. Cole, Exh. H p. 15.

With respect to Opera Solutions, its contract with Stonebranch establishes that its primary office is located at 10 Exchange Place, Jersey City, New Jersey; Stonebranch's invoices also utilize this address. Dec. Clay, Exh. E. Stonebranch's contract with customer [X + 1] Inc. shows that its billing address and location is 50 Washington Street, Norwalk, Connecticut, as does the invoice attached to the exhibit. *Id.* at Exh. D. According to Stonebranch, the address was

---

[2] Gwyn Clay testified that Stonebranch does not physically ship its products because its software is downloaded by its customers. Dec. Cole, Exh. I (Clay Deposition) pp. 49-50. Thus, Stonebranch tracks revenue by region according to the billing addresses provided by its customers. Dec. Clay ¶ 12. The six (6) customers discussed above had New York shipping and billing addresses. *Id.* at ¶¶ 12, 14.

inadvertently entered into Stonebranch's system as "Norwalk, NY." Dec. Cole, Exh. H p. 15; Dec. Clay, Exh. D. In support of its contention that Stonebranch is doing business with [X+1] Inc. in New York, CA submits a copy of an email, dated July 19, 2012, from Stonebranch's senior sales manager for the Northeast, Ellen Mednikoff, to [X+1] Inc.'s Mark Sutterlin, wherein Mednikoff asks Sutterlin about the location of his new office in New York. Sutterlin responded with a New York City address, but simultaneously advised that [X+1] Inc.'s Norwalk, Connecticut address "is still the same." Dec. Cole, Exh. M. Contrary to demonstrating that Stonebranch and [X+1] Inc. are "doing business" in New York, the email establishes that the company opened a new office in New York at some undisclosed time, but that it had been doing business with Stonebranch from its Connecticut office. *Id.*

As to Bayer, its contract with Stonebranch establishes that its billing address was inadvertently entered into Stonebranch's system as "100 Bayer Road, Tarrytown, NY" instead of "100 Bayer Road, Pittsburgh, PA." Dec. Cole, Exh. H p. 15; Dec. Clay, Exh. B. Furthermore, Bayer was actually billed in Pennslyvania as shown by Stonebranch's invoices. Dec. Clay, Exh. B. With respect to CA's allegation that Saks is a New York customer, CA submits a company profile from Hoover's, an online business research company,[3] that has a New York address for Saks and which identifies the owner of Saks as Hudson's Bay Company. According to Hoover's, Hudson Bay Company is headquartered in Toronto, Ontario.[4] Additionally, Stonebranch's contract with Saks, as well as Saks' facsimile cover page, identify its business address as 3455

---

[3] Hoovers, http://www.hoovers.com (last visited November 12, 2014).

[4] Hoovers, http://www.hoovers.com/company-information/cs/company-profile Hudsons_Bay_Company.39261431be490869.html (last visited November 12, 2014).

Highway 80 West in Jackson, Mississippi. Dec. Clay, Exh. C. Finally, Stonebranch customer Reed Elsevier's contract identifies its location and billing address as 9333 Sringboro Pike, Miamisburg, Ohio and CA has produced no evidence to the contrary. Dec. Clay, Exh. F. Accordingly, CA has not established that during the relevant period, Stonebranch was doing business in New York with the above named customers. Consequently, revenue from these companies shall not be considered in determining personal jurisdiction over Stonebranch.

CA also maintains that Stonebranch understated its revenue. Mem. in Opp. p. 6. For 2009, CA contends that Stonebranch had revenue in the sum of $80,020.95, not $2,400, yet the relevant invoice shows a single sale to Depository Trust in the sum of $2,400. Dec. Cole, Exh. J, Bates No. 000109. CA also cites to a 2009 Stonebranch income statement indicating gross accounts receivables in the sum of $50,000 and $18,000 from Saks and approximately $24,000 from Reed Elsevier. Dec. Cole, Exh. K. As discussed above, income from Saks or Reed Elsevier shall not be considered in the analysis. For 2010, CA claims that Stonebranch's New York revenue was $866,599.49 instead of the reported $480,640.99. However, two (2) of the invoices for Depository Trust (Bates nos. 000095 and 000096) are for $75,019.23 and are duplicates except for the dates; invoice 000096 refers to invoice 000095 as the "original invoice." Dec. Cole, Exh. J. For 2011, CA claims that Stonebranch's New York revenue was $555,531.29 and not the reported $160,640.99. Although CA does not specifically refer to any of the documents in the exhibits, presumably its argument is based on Bates numbered invoice 000106, also billed to the Depository Trust, which indicates a total due of $260,179.19. This invoice, as well as the invoices causing the 2010 discrepancies, are for the same customer with whom Stonebranch appears to keep a running balance. Dec. Cole, Exh. J. Thus, considering these invoices would

be duplicative. Finally, CA contends that Stonebranch's 2012 income was $270,994.34 instead of the reported $162,791.37. In support, CA produces two (2) invoices totaling $38,763.13 and also relies upon invoices addressed to Opera Solutions, [X + 1] Inc. and Reed Elsevier, which as discussed above, are not considered. Dec. Cole, Exhs. J and K. Based upon the submitted documents, CA has not demonstrated that Stonebranch failed to include applicable revenue from its New York business dealings.

In fact, income statements for Stonebranch's New York customers demonstrate the following: (a) 2009 total revenue: $9.8 million/ New York revenue: $2400.00 which equals .02%; (b) 2010 total revenue: $9.65 million/New York revenue $480,640.99 which equals 4.99% (c) 2011 total revenue: $10.28 million/New York revenue: $160,527.25 which equals 1.56%; and (d) 2012 total revenue: $9.21 million/New York revenue $162,791.37 which equals 1.77%. Thus, the percentage of revenue generated by sales in New York during the relevant period amounts to 2.1%. *Id.* at ¶ 14 and Exh. A; Rev. Reply (DE 83) p. 2.

To trigger the solicitation-plus test, the sales resulting from " 'solicitation in New York . . . [must first] rise to the level of 'substantial solicitation.' " *Copterline Oy v. Sikorsky*, 649 F. Supp. 2d 5, 16 (E.D.N.Y. 2007) (quoting *Overseas Media, Inc. v. Skortsov*, 407 F. Supp. 2d 563, 569 (S.D.N.Y. 2006)). "Courts consider the percentage of a company's overall revenue that is attributable to its New York business in determining whether solicitation is substantial and continuous." *Id.* Where such sales comprise an "insubstantial portion of defendant's total sales," courts will not find substantial solicitation. *New World Capital Corp. v. Poole Truck Line, Inc.*, 612 F. Supp. 166, 172 (S.D.N.Y. 1985). Instead, defendant's "direct sales into the New York market must constitute a significant portion of the defendant's business activities." *UTC Fire &*

*Sec. Americas Corp., Inc. v. NCS Power, Inc.*, 844 F. Supp. 2d 366, 371 (S.D.N.Y. 2012). "[C]ourts have generally found that a foreign corporation is not present in New York where the corporation derives less than 5% of its overall revenue from New York customers." *Schottenstein v. Schottenstein*, No. 04 Civ. 5851, 2004 WL 2534155, at *11 n.114 (S.D.N.Y. Nov. 8, 2004).

Based upon Stonebranch's revenue from its New York customers, which amounts to 2.1% of its total business receipts for the relevant period, CA has not established, by a preponderance of the evidence, that Stonebranch solicited significant business in New York to trigger the solicitation-plus test. Accordingly, this Court may not exercise personal jurisdiction over Stonebranch.

## III. Conclusion

Based upon all of the foregoing, Stonebranch's motion to dismiss pursuant to FRCP 12(b)(2) for lack of personal jurisdiction is **GRANTED** and the case is dismissed as to this defendant.

**SO ORDERED.**

Dated: November 17, 2014
      Central Islip, New York

s/ Sandra J. Feuerstein
_____
Sandra J. Feuerstein, U.S.D.J.